IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

| | |
|---|---|
| MARILYN NEELY, | ) Civil Action No. 0:07-3338-CMC-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| YORK COUNTY DISABILITIES AND SPECIAL | ) |
| NEEDS BOARD, | ) |
| Defendant. | ) |
| | ) |

      Plaintiff, Marilyn Neely ("Neely"), commenced this action in the Court of Common Pleas for York County on August 29, 2007. Defendant, York County Disabilities and Special Needs Board ("the Board") removed the action to this court on October 8, 2007. Neely alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("§ 1981").[1] The Board filed a motion to dismiss and for summary judgment on June 16, 2008. Neely filed a memorandum in opposition on July 3, 2008, and the Board filed a reply on July 14, 2008.

**SUMMARY JUDGMENT STANDARD**

      When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

F.2d 1001, 1005 (4th Cir.), <u>cert. denied</u>, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material fact</u>." <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985), overruled on other grounds, 490 U.S. 228 (1989).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." <u>Id.</u> at 718-19 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." <u>Baber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992).  The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  <u>Id.</u> and <u>Doyle v. Sentry Inc.</u>, 877 F. Supp. 1002, 1005 (E.D.Va. 1995).  Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (<u>see</u> Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial.  <u>Baber</u>, citing <u>Celotex Corp.</u>, <u>supra</u>.  Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." <u>Mitchell v. Data Gen. Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993) and <u>DeLeon v. St. Joseph Hosp., Inc.</u>, 871 F.2d 1229, 1233 (4th Cir. 1989), n.7.  Unsupported

hearsay evidence is insufficient to overcome a motion for summary judgment.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS

1.      The Board is an agency that provides services in York County, South Carolina to individuals with developmental disabilities.  Mary Poole Aff. I, Para. 3.

2.      Neely, an African-American female, has been a licensed practical nurse ("LPN") since 1975. She began working as a nurse for the Board in 1992.  Neely Dep. 14, 18, 34.

3.      Neely had numerous disciplinary actions taken against her during her employment with the Board.  See Neely Dep. 114.[2]

_____

[2]These disciplinary actions include:
1.      December 1992 - oral reprimand for not responding to a staff request concerning a client who complained of chest pain and vomiting (Neely Dep., Defendant's Ex. 15).
2.      August 1994 - three day suspension for giving a Hepatitis B shot to a consumer without getting a consent form signed and doing so after Neely's supervisor told her that it was too early to give the shot (Neely Dep., Defendant's Ex. 16).
3.      October 1995 - ninety day probation based on several areas of concern including unacceptable quality of work (Neely Dep., Defendant's Ex. 19).
4.      June 1996 - written warning for unacceptable quality of work based on information from the pharmacist (Neely Dep., Defendant's Ex. 20).
5.      March 1998 - three day suspension for insubordination for refusing a supervisor's direct order, also noting concern about Neely telling staff that she did not have time to assess a consumer with a cut (Neely Dep., Defendant's Ex. 21).
6.      November 1998 - oral reprimand because staff had difficulty reaching Neely in a timely manner resulting in an individual not being assessed in a timely manner (Neely Dep., Defendant's Ex. 22).
7.      March 2001 - written reprimand for Neely's failure to report incident involving the potential abuse and neglect of a consumer (Neely Dep., Defendant's Ex. 23).
8.      September 2003 - written warning for Neely's failure to maintain proper
                                                            (continued...)

4.    Denise Swafford ("Swafford"), a white registered nurse, became Neely's supervisor in 2003. Swafford reported to Ann Dodd Dalton ("Dalton"), who was the Board's Administrator until July 27, 2006.   Neely Dep. 36; Mary Pool Aff. II, Para. 5.

5.    Dalton and Swafford reported to Mary Poole ("Poole"), the Executive Director of the Board. The Executive Director oversees all of the activities of the Board and has final decision-making authority on matters related to the Board's functioning.  Neely Dep. 36-37; Poole Aff. I, Para. 4.

6.    Terrance Ard ("Ard") is the residential director for the Board.  He testified that the Board has four categories of facilities, ranging from more to less care: (1) Intermediate Care Facilities ("ICF"), (2) Community Residential Care Facilities ("CRCF"), (3) Community Training Homes,  and (4) Supervised Living Programs.  Ard Dep. 12-14.  An ICF houses consumers requiring the most care, while the Community Training Home is similar to a foster home placement.  Ard Dep. 4-5, 11-14, Sharon McKnight Dep. 9-10.

7.    In July 2006, Neely worked at several of the Board's facilities, including its Bird Street facilities.   The Bird Street facilities consisted of two group homes (Bird-male and Bird-female) where the Board's consumers resided.  Eight males resided in Bird-male and

---

[2](...continued)
records and for complaints from staff members who were hesitant to call if Neely was the nurse on call because she answered abruptly, made staff feel as if they were bothering her, and were often not given any instructions (Neely Dep., Defendant's Ex. 24).

9.    August 29, 2005 - written warning for Neely's failure to maintain harmonious relationships.  It noted three incidents where staff or contracted providers reported that Neely spoke to them in a rude manner (Neely Dep., Defendant's Ex. 26).

eight females resided in Bird-female. The Bird Street facilities are situated immediately adjacent to one another. Neely Dep. 48-51 and Defendant's Ex. 11; Ard Dep. 64.

8. The Bird facilities were originally ICFs, but were converted to CRCFs in 2005. CRCFs are generally less expensive to operate than ICFs because in most CFCFs nursing is not required and a Medicaid waiver can be used to access additional resources. Ard Dep. 15-16.

9. Sharon McKnight, an African-American female, was the director of the Bird facilities in 2006. Ard was McKnight's supervisor. See McKnight Dep. 6, 53; Ard Dep. 15.

10. Direct Support Supervisors ("DSPs"), who are caregivers for the consumers, work at the CRCFs. DSPs are not nurses. See Angela Spence Dep. 5.

11. At an ICF, a licensed nurse is required to pass out medications. A licensed nurse is not required at a CRCF unless there is a consumer-specific issue. Ard Dep. 20, 24.

12. There are four CRCF facilities in York County: Bird-female, Bird-male, Meadowlark, and Marret. The Bird Street facilities had nurses assigned because they housed some consumers who were "brittle diabetics."[3] Ard Dep. 64-65.

13. Staff at the Bird facilities, including DSPs, received training in the Heimlich maneuver ("Heimlich")[4] and cardiopulmonary resuscitation ("CPR."). See Carrie Jamison Dep. 27; Angela Spence Dep. 20.

---

[3]Brittle diabetes is "type 1 diabetes mellitus that is characterized by wide, unpredictable fluctuations of blood glucose values and is difficult to control." Dorland's Illustrated Medical Dictionary 506 (30th ed. 2003).

[4]The Heimlich maneuver is "a method of dislodging food or other material from the throat of a choking victim; after wrapping the arms around the victim at the belt line and allowing his upper torso to hang forward, make a fist with one hand and grasp it with the other; with both hands placed against the victim's abdomen slightly above the navel and below the rib cage; forcefully press the abdomen with a quick upward thrust." Id. at 1094.

14.      In May 2006, Neely received an employment evaluation in which she scored 54 (out of 100). This was classified at the low end of the "Standard" or "Good" Performance (50-78) range. In the evaluation, Swafford noted that "[Neely's] quality of work, productivity, documentation and initiative are all unacceptable. In an effort to address the areas, Marilyn will be on a 30-day work performance plan. See attached." Neely noted that she strongly disagreed with Swafford's evaluation of her performance and she, Swafford, and Dalton all signed the evaluation. An unsigned copy of the performance plan was produced by the Board. Neely Dep., Defendant's Ex. 29. Neely has produced a copy of the performance plan that was purportedly signed by Swafford on August 4, 2006 (a day after Neely's termination). Plaintiff's Opp. Mem., Ex. J.

15.      On July 28, 2006, an incident occurred involving a mentally and physically disabled consumer at Bird.

16.      On that day, Neely was working a 7 a.m. to 7 p.m. shift. She completed the morning medication pass to consumers at the Bird facilities and attended a drug review meeting at the Board's Rock Hill Work Activity Center, which is approximately six miles away from the Bird Street facilities. Neely then went to the Bird-male facility to carry out the afternoon medication pass. While there, Neely overheard a conversation between one of the consumers and the staff. The consumer, who did not have any teeth, told staff that he could not chew an apple and that if he ate an apple it would get stuck in his throat. Neely told the staff not to give that consumer an apple. Neely Dep. 59-64, 136.

17.      Neely next went to Bird-female where Carrie Jamison ("Jamison"), an African-American female who was the Bird-female staff supervisor, and Roshaunna McCullough, a DSP, were

6

present. Neely indirectly supervised Jamison. Neely Dep. 64, 89, 139, 177-178; McCullough Dep. 4.

18.    While Neely was dispensing medications to the female consumers, Jamison received a call from Bird-male. Neely heard Jamison say into the phone that she [Jamison] would let the nurse know. Jamison got off the phone and told Neely that Sarah Hollingsworth ("Hollingsworth"), a DSP at Bird-male, reported that a consumer (the same consumer discussed above) was choking on a piece of apple, and Hollingsworth had called 911. Neely Dep. 64-65, 76.

19.    Neely was the only Board nurse present at the Bird facilities at the time of the incident.[5]

20.    Neely states that Jamison told her to finish giving out the medicine and that she (Jamison) would go to Bird-male to make sure the DSPs at Bird-male were doing the Heimlich and would call Neely if Neely was needed. Neely Dep. 65.

21.    Neely continued with the afternoon medication pass at Bird-female which took approximately fifteen minutes to complete for the three remaining consumers at Bird-female. Neely Dep. 69.

22.    At Bird-male, multiple staff members took turns doing the Heimlich on the choking consumer and EMS personnel also performed the maneuver, but the apple could not be dislodged and the consumer was transported by ambulance to the hospital for treatment. See Neely Dep. 92.

---

[5]Neely argues that she was not the only nurse on duty because another LPN was on call. There is no evidence, however, that the other LPN was on site at the time. McCullough testified that she had a Certified Nursing Assistant license at the time. McCullough Dep. 4. There is, however, no indication that McCullough, a DSP, was employed as a nurse for the Board.

23.    After completing the medication pass at Bird-female, Neely started walking up to Bird-male to check on the choking consumer.  As she was walking to Bird-male, Neely saw a fire truck.  After arriving at Bird-male, Neely asked where the consumer was and she was informed that he had been taken to the hospital.  Neely Dep. 75.

24.    Later that day, Poole learned that one of the consumers at the Bird Street facilities had a serious choking episode and the consumer was transported by ambulance to the hospital.  She states that she subsequently learned that Neely (who was working at the Bird facilities) was informed that a consumer was choking, but did not  immediately respond to the incident.  Poole instructed Jacqueline Davis ("Davis"), an African-American female who was the Board's Human Resources Director, and Swafford to conduct an investigation into the incident.  Poole Aff., Paras. 5, 6; see also Neely Dep. 101.

25.    On August 1, 2006, Swafford called Neely and informed her that the Board was investigating the choking incident.  A Human Resources Activity Sheet, indicating that Neely was placed on administrative leave, was signed as approved by Swafford with Final Approval signed by Poole.  Neely Dep. 99-100 and Defendant's Ex. 12.

26.    Davis, her assistant Deborah Stark, and/or Swafford obtained statements from Jamison and Hollingsworth.  Davis. Dep. 8-9.  Swafford spoke with Neely and asked her to provide information.  Neely had an opportunity to present her side of the story.  Neely Dep. 99.

27.    Davis and Swafford recommended to Poole that Neely be terminated.  Poole Aff., Para.; Davis Dep. 7, 11-14; Swafford Dep. 31-32.

28.    Poole states that Davis and Swafford each recommended Neely's termination, she considered the recommendations, and made the decision to terminate Neely based on what she perceived to be Neely's negligent response to an emergency situation.  Poole Aff., Paras. 7-8.

29.     On August 3, 2006, Davis and Swafford met with Neely and explained that she was being terminated because of her negligent response to the July 28th choking incident. They issued a disciplinary action form to Neely that described the events of July 28th and concluded that there was negligence in the performance of Neely's job duties. Neely Dep. 101-102, Defendant's Ex. 13.

30.     Neely was terminated effective August 3, 2006. She was presented with the termination form, but refused to sign it. Neely Dep. 106-107 and Defendant's Ex. 13.

31.     After Neely's termination, Joyce McClurkin ("McClurkin"), an African-American, was picked to replace Neely. After McClurkin's employment with the Board ended, her position was filled by Geneva Bankhead ("Bankhead"), an African-American who is still employed with the Board. Davis Dep. 4.

32.     On approximately November 28, 2006, Neely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that the Board discriminated against her on account of her race when it terminated her. Neely Dep. Defendant's Ex. 4. The EEOC issued a notice of right to sue on May 30, 2007.

## DISCUSSION

Neely alleges that she was discharged based on her race in violation of Title VII and § 1981.[6]

The Board contends that it is entitled to dismissal of Neely's § 1981 claim and to summary judgment on Neely's Title VII claim.

_____

[6]The Board argues that it should be granted summary judgment as to any claims for failure to promote, disparate discipline, or racial harassment because: (1) Neely did not assert these claims in her Complaint, (2) she did not exhaust her administrative remedies as to any such claims, (3) these claims are time barred, and (4) Plaintiff fails to show an adverse employment action as to these claims. Neely does not appear to dispute this, but argues that evidence of these alleged actions is relevant to show racial mistreatment as to her termination.

A.     **§ 1981 Claim**

The Board contends that Neely's § 1981 claim should be dismissed because: (1) the Eleventh Amendment bars the claim and (2) Supreme Court decisions foreclose any § 1981 claim against the Board, which is an arm of the State.

(1)     Eleventh Amendment Immunity

The Board contends that Neely's § 1981 claim should be dismissed because it is entitled to Eleventh Amendment immunity. Neely argues that the Board's motion to dismiss should be denied because there is a factual dispute as to whether the Board is an arm of the State, the Board waived the right to assert the Eleventh Amendment defense, and the Board failed to disprove its consent to suit.

The Eleventh Amendment to the United States Constitution prohibits "any suit ... against one of the United States by citizens of another State," U.S. Const. Amend. XI, and (as interpreted) by its own citizens, Hans v. Louisiana, 134 U.S. 1 (1890); Seminole Tribe v. Florida, 517 U.S. 44, 54, (1996). This immunity extends to suits against state agencies. Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 100 (1984). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity [cites omitted] or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989).

Neely argues that the Board is not entitled to Eleventh Amendment immunity because there is a factual dispute as to whether the Board is an arm of the State. Specifically, Neely claims that the

Board is not an arm of the State because the State of South Carolina has declared in public records that County Disability and Special Needs Boards are not state entities.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" and state agencies, divisions, departments and officials are "arms of the State." Will, 491 U.S. at 70.  A determination that the state treasury will be liable for judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity.  See Gray v. Laws, 51 F.3d 426 (4th Cir. 1995); see also Nivens v. Gilchrist 444 F.3d 237 (4th Cir. 2006)(stating that in determining whether a defendant is entitled to Eleventh Amendment immunity it must first be established whether the State's treasury will be affected by the law suit and noting that if the answer is yes, that defendant is immune under the Eleventh Amendment).

Poole states that the Board operates under the laws and regulations of the State of South Carolina, receives funding from the State of South Carolina, approximately ninety percent of the Board's funding is from South Carolina state appropriations, the Board is insured through the South Carolina Insurance Reserve Fund, and the Insurance Reserve Fund provides tort liability coverage to the Board in this action.  Poole Aff., Para. 3.  Neely has presented nothing to dispute that the State of South Carolina would be liable.  Thus, it is recommended that the Board be found to be entitled to Eleventh Amendment immunity.  See Hedberg v. Darlington County Disabilities and Special Needs Bd., 133 F.3d 915, *2 (4th Cir. 1997)(unpublished)(upholding District Court Judge Cameron M. Currie's ruling that the Darlington County Disabilities and Special Needs Board was an instrumentality of the State entitled to Eleventh Amendment immunity).

Neely claims that the Board should not be allowed to assert an Eleventh Amendment defense because it involved this Court's jurisdiction when it removed this action to federal court.  The Board

contends that removal of this action from state court to federal court does not constitute a waiver of its Eleventh Amendment immunity because the Board did not consent to a § 1981 claim in state court and was not seeking to regain immunity it abandoned previously.

A state's removal of suit to federal court may constitute a waiver of its Eleventh Amendment immunity. <u>See</u> <u>Lapides v. Board of Regents</u>, 535 U.S. 613 (2002); <u>see also</u> <u>Palotai v. University of Md. at College Park</u>, 38 Fed. Appx. 946, 2002 WL 1379969 (4th Cir. 2002)(unpublished)(noting that the University of Maryland waived its Eleventh Amendment immunity by removing case to the District Court). The Fourth Circuit, however, has recognized a limitation of the holding in <u>Lapides</u>:

> We believe the district court read the rule of <u>Lapides</u> too broadly. <u>Lapides</u> addresses whether a state that removes an action to federal court having already consented to suit in its own courts can invoke Eleventh Amendment immunity; it does not resolve whether a state that has not consented to suit in its own courts maintains either the broader concept of sovereign immunity or Eleventh Amendment immunity upon voluntarily removing a case to federal court.

<u>Stewart  v. North Carolina</u>, 393 F.3d 484, 488 (4th Cir. 2005). In further discussion of <u>Lapides</u>, the <u>Stewart</u> court noted that "[b]ecause Georgia had already consented to suit in its own courts, the only issue was whether the state could regain immunity by removing the case to federal court and invoking the Eleventh Amendment." <u>Id.</u> Here, however, the Board seeks Eleventh Amendment immunity as to Neely's federal claim brought pursuant to § 1981, not a state claim.

Neely next argues that the Board failed to demonstrate that it did not consent to Federal Court jurisdiction when it accepted federal monies. A state waives its constitutional immunity by "voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs." <u>Constantine v. George Mason Univ.</u>, 411 F.3d 474, 491 (4th Cir. 2005). Although Neely believes that the Board has accepted federal funding, she has

presented no evidence of this and has not shown that any federal funds received were conditioned on a waiver of Eleventh Amendment immunity.

(2)     § 1983 as Exclusive Federal Remedy for § 1981 violation

The Board also contends that Neely's § 1981 claim is foreclosed by the United States Supreme Court's decisions in Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989) and Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989).   Neely also argues that even if the Board is an arm of the State, it is subject to suit under § 1981 and should still be considered a "person" under § 1981.

When a plaintiff asserts claims against a state actor of violation of federal law, § 1983 provides the exclusive remedy--even when the plaintiff alleges violation of rights guaranteed by § 1981.  Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir.1995) (citing Jett, 491 U.S. at 733). The Fourth Circuit has held the Civil Rights Act of 1991 did not overturn the Supreme Court's interpretation of § 1981.  See id. at 156 n.1; Burns v. Bd. of County Comm'rs of Jackson County, 330 F.3d 1275, 1288 n. 10 (10th Cir. 2003).  Accordingly, it is recommended that summary judgment be granted to the Board as to Neely's § 1981 claim.

**B.     Title VII Claim**

Neely alleges that she was discharged based on her race in violation of Title VII and § 1981.[7]  The Board contends that Neely fails to establish a prima facie case of race discrimination

---

[7]In the event that Neely's § 1981 claim is not dismissed, the standard for establishing claims of employment discrimination under either Title VII or §1981 is the same.  See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1285-86 (4th Cir. 1985). Therefore, the analysis that follows, though couched in terms of Title VII, would apply equally to Neely's § 1981 claim.

and it has articulated a legitimate, non-discriminatory reason for its action which Neely fails to show is pretextual.

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can establish a claim in two ways.  First, under Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), an employee can offer sufficient direct or circumstantial evidence of impermissible racial motives for the discharge.[8] Id. at 101.  Second, a plaintiff can establish a prima facie case of discriminatory discharge under Title VII by showing: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time the employer took the adverse employment action, he was performing at a level that met his employer's legitimate expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class or other employees who are not members of the protected class were retained under apparently similar circumstances.  See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004); King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003).  When a plaintiff makes a showing sufficient to support a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If the employer produces a legitimate reason for the action, the burden once again shifts to the plaintiff to show that the employer's

---

[8]Neely does not discuss a claim under the mixed-motive framework.  Further, she fails to present any evidence from which a reasonable jury could conclude that the protected factor (her race) was a motivating factor in the Board's decision to terminate her.  See Desert Palace, 539 U.S. at 101; Love-Lane v. Martin, 355 F.3d 766, 786-87 (4th Cir.2004).

rationale is a pretext for discrimination. Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

        (1)      Prima Facie Case

        The parties do not dispute that Neely meets the first and second prongs of her prima facie case, as she is a member of the protected class and was subjected to an adverse employment action (termination). The Board contends that Neely fails to establish her prima facie case because she cannot show that she was meeting the Board's legitimate expectations at the time she was terminated and cannot establish the fourth prong of her prima facie case.

        (a)      Legitimate Expectations

        The Board contends that Neely fails to meet her employer's legitimate expectations because she admitted that her conduct warranted suspension[9] and she received unfavorable comments in her written evaluation shortly before her termination.[10] Neely contends that she was meeting her employer's legitimate expectations because: (1) the six evaluations preceding her discharge all indicate "meets" or "above standards" ratings; (2) the evaluation just two months

---

[9]The Board cites to the following deposition questions and Neely's answers:
Q. So why do you believe that it was race that was motivating York County DSN's decision to terminate you?
A. I think it was race motivating to terminate me because I didn't have to be terminated. I could have been sent home for three days.
Q. Well, I understand that–well, do you believe that a three-day suspension would have been appropriate?
A.      Yes.
Neely Dep. 139.

[10]As noted above, in Neely's May 2006 evaluation, Swafford wrote:
[Neely's] quality of work, productivity, documentation and initiative are all unacceptable. In an effort to address the areas, Marilyn will be put on a 30-day work performance plan. See attached.
Neely Dep., Defendant's Ex. 29.

before Neely's termination reflects a "meets" rating; (3) there was much other evidence, including that of three current or former co-workers and managers, that illustrates positive performance;[11] and (4) Swafford stated (after the May 2006 evaluation) that Neely's performance was improving (Neely Dep. 127).

There is much conflicting evidence as to Plaintiff's performance. In the light most favorable to Neely for purposes of summary judgment, Neely has presented sufficient evidence that she was meeting the Board's legitimate expectations.

(b)    Fourth Prong

The Board contends that Neely fails to establish the fourth prong of her prima facie case because she cannot show that she was replaced by a person who was not a member of the protected class. Neely does not dispute that she was replaced by another nurse who was a member of the protected class, but argues that she can establish the fourth prong because there was a different decisionmaker as to her termination and the hiring of her replacement.

In the Fourth Circuit, a Title VII plaintiff must ordinarily show replacement outside the protected class in order to establish the fourth prong of his or her prima facie case. Miles v. Dell, Inc., 429 F.3d 480 (4th Cir. 2005). "[R]eplacement within the protected class gives rise to an inference of non-discrimination with respect to the protected status. The fourth prong requires [a

---

[11]McKnight stated that she thought Neely was an excellent nurse and the three other white LPNs that worked at the Bird facilities were less than excellent. McKnight Dep. 4-5, 18. Jamison, the Bird-female manager who Neely stated she indirectly supervised, states that she thought Neely was an excellent nurse. Jamison Dep. 37. The Board contends that these opinions fail to show that Neely was meeting their legitimate expectations because McKnight and Jamison were not nurses and did not supervise Neely during the relevant time period. Defendant's Reply at 8.

Ard testified that Plaintiff's performance was average. Ard Dep. 29, 81-82. Neely received a thank you certificate for her work on the transition of facilities from ICFs to CRCFs in June 2005, and she received a certificate of recognition for twelve years of service with the Board. Ard Dep. 50-51, 52-53, Exs. 1 and 2.

plaintiff], as part of [his or her] prima facie case, to eliminate this inference of non-discrimination." Miles at 488. Exceptions, however, have been recognized. In Brown v. McLean, 159 F.3d 898 (4th Cir. 1998), the Fourth Circuit recognized that possible exceptions in an age discrimination case were: (1) replacement by someone much younger, (2) a significant lapse of time between the adverse employment action and the decision to hire another person, and (3) the employer's hiring of another person within the protected class that was calculated to disguise its act of discrimination. Id. at 905-906. In Miles, the Fourth Circuit noted that these exceptions were not all-inclusive and recognized another exception, where there are different decisionmakers as to the termination of the plaintiff and the hiring of the plaintiff's replacement.

The Board asserts that the decisionmaker in Neely's termination was Poole. Neely disputes that Poole was the decisionmaker and asserts that Swafford was the decisionmaker. The Board provides (and Neely does not dispute) that Neely was replaced by an African-American LPN. The person who made this hiring decision has not been identified by the parties. In her opposition memorandum, however, Neely argues that Swafford was the one who hired the successor African-American LPN and that she has met the fourth prong based on the Board's assertion that Poole was the termination decisionmaker.

Neely's conflicting arguments fail. She first asserts that Swafford was the decisionmaker as to her termination and as to the hiring of Neely's replacement. Assuming this is true, the termination and hiring were made by the same decisionmaker. If Poole was the termination decisionmaker and Swafford was the replacement hiring decisionmaker, Neely's alternative argument fails under Hill v Lockheed Martin Logistics Mgt., 354 F.3d 277 (4th Cir. 2004) because Neely fails

17

to show any discriminatory animus on the part of Poole.[12]  The Fourth Circuit held in <u>Hill</u> that "an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision." <u>Hill</u>, 354 F.3d at 291.

The <u>Miles</u> exception is not applicable here.  In <u>Miles</u>, the plaintiff was fired by James Glaze ("Glaze"), her supervisor (who allegedly made numerous sexually harassing or disparaging comments to Miles and other female employees).  Glaze sought to hire a male employee to replace Miles.  Glaze's supervisor, however, insisted that Glaze hire another female employee to replace Miles. Thus, in <u>Miles</u> the inference of non-discrimination by Miles' supervisor was defeated because the decision to replace her with another person within the protected class (female) was made not by

---

[12]Neely claims that Poole was not the decisionmaker because Poole merely rubber-stamped Swafford's decision.  "When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision...." <u>Hill</u>, 354 F.3d at 290.  An employee who did not make the actual adverse employment decision, however, will not qualify as the decisionmaker even when "he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision." <u>Id.</u> at 291.  The burden rests on the plaintiff to prove that the person who allegedly acted with discriminatory intent was the actual decisionmaker. <u>Id.</u>

Neely has not met her burden to show that Swafford, rather than Poole, was the actual decisionmaker.  Poole states that she considers herself a "hands-on" executive who is personally involved in all important matters of the Board including the suspension or termination of employees. She provides that Davis and Swafford do not have the authority to overrule her decision.  Poole states that she was personally involved in the Board's actions to place Neely on administrative leave pending the outcome of the investigation and to terminate her as a result of her response to the choking consumer.  She directed Davis and Swafford to conduct an investigation and received daily briefings and updates on the findings.

Poole also states that Davis and Swafford each recommended to her that Plaintiff be terminated.  She considered and ultimately agreed with their recommendations and would have made the decision to terminate Neely even if Davis and Swafford offered a different recommendation.  In her view, Neely's lack of an immediate response and placement of a higher priority on completing a regular medication distribution to consumers who were not in medical distress, rather than attending to a choking consumer in a life-threatening situation, warranted Neely's termination. Finally, Poole states that she makes an independent judgment in each case and has previously rejected the personnel recommendations of Board employees when her perspective has differed from theirs.  Poole I Aff., Paras. 6-8.

0:07-cv-03338-CMC    Date Filed 02/23/09    Entry Number 62    Page 19 of 27


Mile's supervisor, but by a higher-up employee. In contrast, Neely asserts that Swafford was the employee that fired her and discriminated against her, but also states that Swafford hired the replacement LPN from Neely's protected class.

Neely next argues that she has established her prima facie case because the hiring of a successor African-American LPN was a ruse to disguise discriminatory treatment as her African-American replacement (McClurkin) was terminated a short time thereafter. Neely fails to establish the fourth prong of her prima facie case under a ruse theory. She has presented no evidence to show that McClurkin was terminated a short period of time after she was hired. Further, McClurkin was replaced by Bankhead, another African-American LPN, who is still employed by the Board.

Neely also appears to argue that she has established the fourth prong of her prima facie case based on Swafford's alleged discrimination against Neely, including favoritism toward white LPNs and promotions of white LPNs instead of Neely.[13] She also claims racial bias because Swafford

---

[13]Neely claims that Swafford discriminated against her based on her race because Swafford treated other white LPNs more favorably; Swafford disciplined Neely more harshly than white LPNs; and Swafford promoted white LPNs, but did not promote Neely. It should be noted that Neely has not asserted a harassment, disparate discipline, or failure to promote claim in her Complaint. She also has not shown that she was subjected to any adverse employment action as a result of these alleged actions.

Neely testified that she was treated worse than white nurses because Swafford helped white LPN Hope Anderson ("Anderson") pass out medicines on approximately five different occasions, but Swafford did not help Neely pass out medications (there is no indication that Neely asked Swafford to do so). She claims that Anderson did not get disciplinary write-ups for actions for which Neely was disciplined, but admits that she has never seen Anderson's personnel file and did not know if disciplinary actions were imposed on Anderson. Neely also claims that two white LPNs (who were allegedly less qualified than her) were promoted to lead LPN positions. She, however, does not know if these LPNs received more money after they were promoted and testified that one of these LPNs told her than the job meant no more money, just more work. See Neely Dep. 141, 144-159.

McKnight testified that Swafford interacted a little more with the white LPNs and was strictly (continued...)

terminated two African-American LPNs from the Bird facilities, but no white LPNs.[14]  In <u>Miles</u>, however, the Fourth Circuit specifically rejected the argument that a plaintiff may bypass the fourth prong whenever the totality of the evidence gives rise to an inference of discrimination.  <u>Miles</u>, 429 F.3d at 487.  Thus, Neely fails to establish the fourth prong of her prima facie case.

        (2)     <u>Legitimate, Non-Discriminatory Reason</u>

Even if Neely can establish a prima facie case of discrimination, the Board has articulated a legitimate, non-discriminatory reason for terminating Neely, that she was negligent in her nursing duties.

        (3)     <u>Pretext</u>

Neely contends that she has presented evidence of pretext because: (a) the Board asserts that Poole was the decisionmaker, but it is clear that Swafford was the decisionmaker; (b) Neely was terminated for negligence, but the facts reveal that there was no negligence; (c) the Board asserts that Neely was a poor performer, but there is contradictory evidence of this; (d) Neely was terminated for violating the Nurse Practice Act ("NPA"), but she was never trained in it, the

---

[13](...continued)
business with Neely, but would talk with the white LPNs about personal matters.  She states that based on her common sense, college degree, and lifelong experience she believed Swafford had some type of racial animosity towards Neely.  McKnight, however, also admitted that her opinion was not based on any personal knowledge of discrimination and confirmed that Swafford acted professionally toward Neely.  McKnight Dep. 39-40, 44, 54-55.

Jamison testified that Swafford did not have a lot of interaction with Neely, but Swafford would talk with Anderson, helped Anderson pass out medications on more than one occasion, and would go behind closed doors to talk with Anderson a lot.  Jamison Dep. 37-38.  Spence testified that Swafford was friendlier with the white nurses than with Neely and interacted more with white nurses than Neely.  Spence Dep. 13-15, 17-18.

[14]Swafford, however, testified that she recommended that eight nurses be terminated, six white and two African-American.  Swafford Dep. 33-36.

NPA was not in the job description, the NPA was not posted in the work site, and Neely never reported to the Nursing Board; (e) Neely was not the only licensed medical professional on duty at the time of the alleged incident; (f) Neely made a judgment call; (g) the investigation was shoddy; (h) Swafford was the decisionmaker and she was racially discriminatory; (i) contrary to the Board's position, non-nurse staff did carry out medical duties; and (j) the Board cannot show that Swafford solicited an  African-American LPN to replace Neely because the alleged replacement already worked for the Board and was terminated not long thereafter.  Defendants contend that Neely fails to establish that their legitimate, nondiscriminatory reason was false or pretextual.  Review of each of Plaintiff's arguments (discussed further below) reveals that Plaintiff fails to show that the Board's articulated, non-discriminatory reason was false or was pretext for discrimination.

a.     <u>Decisionmaker</u>

Neely claims she has presented pretext because the Board asserts that Poole was the decisionmaker, but in her discussions with Swafford and Davis it was clear that Swafford was the decisionmaker.  As discussed above, Neely fails to present sufficient evidence to dispute Poole's statements that she considered the evidence and made the ultimate decision to terminate Neely.

Neely argues that the Board's own written termination policies do not require Poole to terminate employees and permits lesser managers to do so, the Board's own grievance procedures reject the position that the Executive Director (Poole) is necessary to make the final decision, the Board's own written termination policies were not followed with respect to the termination documents, the termination documents do not bear Poole's signature, and the termination documents do not bear a signature authorizing the termination (required by the policy).

Under the Board's policies, the Executive Director had the authority to terminate Neely (or any other employee).  Poole Aff. II, Att. A, p. 1, no. 3.  As the position of Administrator was vacant at the time of Neely's termination (Dalton's last day was one day prior to the choking incident), there was no Administrator who could have participated in the decision.  Poole Aff. II, Para. 5.  The fact that an employee handbook provides termination authority does not mean that the Executive Director could not terminate Neely.  Neely has presented nothing to show that the Executive Director was required to sign the termination form and the form provides that "it is recommended that your employment be terminated" which supports the Board's argument (Neely Dep., Defendant's Ex. 13).  That the Executive may have the final say on a grievance appeal does not preclude her from being the final decisionmaker with regard to Plaintiff's termination.  See, e.g., Gray v. Laws, 51 F.3d at 439 n. 8 (recognizing "there is a presumption that government officials can and will decide particular controversies conscientiously and fairly despite earlier involvement in their investigation")(citation omitted).

     b.    <u>Negligence</u>

Neely argues that she was not negligent because there was no emergency; she was not requested or needed; all staff were trained in CPR and the Heimlich maneuver; there were prior incidents of consumer choking in facilities without nurses; the Board implies an alternative reason for termination (poor performance); and Swafford testified that she would not post-date a counseling or discipline form, but she did so after Neely was terminated.[15]  Neely, however, admitted it was an emergency situation.  See Neely Dep. 88.  Further, she admitted that her conduct during the

---

[15]Neely appears to argue that she did not receive the performance plan at the time of her last evaluation, but in her deposition she appears to admit that she knew about the plan and was presented with the form. See Neely Dep. 148.

incident was sanctionable (although she thought it only merited a three-day suspension rather than termination).  Neely Dep. 139.

Neely argues that Poole was not qualified to determine whether there was negligence.  Poole asserts that she was qualified because she served as an instructor in CPR/First Aid.  See Poole Aff. II, Para. 6.  Even if Swafford was the only person qualified to determine negligence, that does not mean she was the actual decisionmaker.  Sutton v. Cree, Ind., 386 F. Supp. 2d 600, 606 (M.D.N.C. 2005)("The mere fact that a management employee reviewed, evaluated, and supplied information, favorable or unfavorable, to the decisionmaker does not elevate that employee to a decisionmaker status absent evidence that the employee had authority to overrule the final decision."), aff'd 172 Fed. Appx. 485 (4th Cir. 2006).

Further, although Plaintiff now disputes that she was negligent, this does not show that the articulated reason for her termination was false or was not the real reason for the action.  See, e.g., Hawkins v. PepsiCo, Inc., 203 F.3d 274 (4th Cir. 2000); Kun v. Berkeley County Gov't, 214 F. Supp.2d 559, 566 (D.S.C. 2001), aff'd, 32 Fed. Appx. 689, 2002 WL 570670 (4th Cir. Apr. 17, 2002).  Federal Courts "do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants."  Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005), citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir.1998); see also Rowe v. Marley Co., 233 F.3d 825, 831 (4th Cir. 2000)("The decision to discharge [plaintiff] and retain [other employees] is the kind of business decision that we are reluctant to second-guess."); see also Swanson v. General Servs. Admin., 110 F.3d 1180, 1186 (5th Cir. 1997)(holding that "[t]he pretext question is not a question whether [the plaintiff] 'considered himself' late, but whether [the employer] considered [the plaintiff] late when he decide to charge [the plaintiff] with annual leave for his tardiness").

23

c.     <u>Poor Performer</u>

Neely argues she was terminated for poor performance, but she was not a poor performer based on her positive performance evaluations (including her most recent "good" one), testimony from co-workers and managers, Administrator Ard's testimony, and Swafford's statement to her that she was improving. Although Neely's past performance is discussed by the Board regarding whether Neely was meeting its legitimate expectations, her termination form indicates she was terminated for negligence as to the consumer choking incident. Second, although there is some conflicting evidence as to whether Neely was meeting the Board's legitimate expectations, she has not disputed that she has a long history of disciplinary actions. Third, she has not disputed that her supervisor wrote on her last evaluation that her work, productivity, and initiative were unacceptable. <u>See</u> Neely Dep., Defendants' Ex. 10.

d.     <u>NPA</u>

Neely argues that she has shown pretext because the Board states that she failed to comply with the NPA, but she was never trained in the NPA, the NPA was not in her job description, the NPA was not posted in the work site, and she was never reported to the Nursing Board. Neely, however, has not shown that any reliance on the NPA is a "different justification[]" or that it was offered at a "different time[] such that it could be evidence of pretext. <u>See</u> <u>E.E.O.C.</u> <u>v. Sears Roebuck & Co.</u>, 243 F.3d 846, 852-53 (4th Cir. 2001). The NPA applies to all nurses, i.e., this is not something that the Board made up as being applicable to Plaintiff. <u>See</u> S.C. Code Ann. § 40-33-5; <u>see also</u> Princess Davis Aff., Att. A, p. 3. Under the NPA, "[i]ncompetence" includes a nurse's failure to demonstrate care required by the "generally accepted standards of the profession." S.C. Code Ann. § 40-33-20(32). Additionally, violation of the NPA was not the reason stated for Neely's termination and the NPA merely discusses the standard or definition of negligence.

24

  e.  <u>Not the Only Licenced Medical Person</u>

    Neely claims that the Board incorrectly concluded that she was the only licensed medical person on duty because there was an on-call nurse and McCullough was a licensed CNA.  There is no indication that the on-call nurse was present (or needed to be called since Neely was there) and, as discussed above, there is no indication that McCullough (a DSP) was employed as a nurse  by the Board.  Further, Neely testified that the nurse who was on duty was the only licensed medical professional on duty.  Neely Dep. 52.

  f.  <u>Judgment Call</u>

    Neely argues that she was terminated for what was a judgment call, even if the judgment was wrong.  She argues that nurses were assigned to administer medications, everyone was trained in CPR and the Heimlich, there were prior choking incidents at facilities without nurses, nurses were only assigned to the Bird Street facilities because of brittle diabetics, and she was treating a brittle diabetic.  Plaintiff appears to claim that passing out medications was more important than helping the other employees with the choking consumer.  Although she disagrees with the Board as to which task was more important, she fails to show that the Board's articulated reason was false.

  g.  <u>Shoddy Investigation</u>

    Neely claims that the investigation was limited as investigators only spoke with three actual witnesses to the events (Neely, Jamison, and Hollingsworth), ignored other witnesses (EMS, McCullough, and Sherrie Howe - an employee at the male facility), and "made factual conclusions out of whole cloth."  Plaintiff's Opp. Mem. at 10.  She claims that all witnesses corroborated her version, there was no evidence that she was requested to go to the scene, and there was no evidence from witnesses that she was so slow that EMS came down twice to speak with her.

Neely's allegations are contradicted by Hollingsworth who stated that she phoned Jamison and said "we need the nurse to come right away." Hollingsworth Aff., Para. 2 and Att. A. Further, even if Neely can prove that the investigation is insufficient or that the conclusion was incorrect, she has not shown that her termination occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Johnson v. Ready Mixed Concrete Co., 424 F.3d 806 (8th Cir. 2005)(the difficulty with arguing that an investigation was done poorly is not only must the employer be shown to have been incorrect in its conclusion, but it must be shown that the employer did not really believe its conclusion per the investigation).

h.     Swafford was the Decisionmaker and she was Racially Biased

Neely argues that Swafford was the decisionmaker and Swafford was racially biased (she claims there is evidence from various witnesses as to Swafford's mistreatment of Neely, under Swafford's watch, the only two LPNs terminated from the Bird Street facilities were African-American, and under Swafford's watch two white, less-qualified LPNs were promoted over Neely). These argument have been addressed earlier. Neely fails to dispute Poole's assertions that she (Poole) was the decisionmaker. Additionally, none of the allegations of racial bias have any bearing on the termination decision. As discussed above, Swafford also stated that she terminated six white LPNs (and Neely has presented no evidence to the contrary) and there is no indication that the promotions (if that is what they truly were) were racially motivated.

26

i.    <u>Non-Nursing Staff Carried Out Medical Duties</u>

Neely argues that non-nurse staff carried out medical duties because they dispensed medications, were CPR-Heimlich trained, received medical training from Swafford about medications, and responded to prior choking incidents.  There is simply no indication that these assertions show that the Board's reason for terminating Neely was false.

j.    <u>Swafford Did Not Seek Out African-American Replacement Because Replacement Already Worked for the Board</u>

Neely argues that her replacement worked for the Board and was terminated shortly thereafter.  It is unclear how the fact that Neely's African-American replacement was transferred from another position with the Board is evidence of pretext.  Further, as discussed above, her replacement was also replaced by an African-American LPN.

**<u>CONCLUSION</u>**

Based on the foregoing, it is recommended that Defendant's motion to dismiss and for summary judgment (Doc. 36) be **granted**.

_____
Joseph R. McCrorey
United States Magistrate Judge

February 23, 2009
Columbia, South Carolina

27